IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

LEVESTER GILLARD                                                       PLAINTIFF

v.                          Civil No. 04-4106

AMY KUYKENDALL, Jail Administrator,
Howard County Jail; and
BUTCH MORRIS, Sheriff, Howard
County, Arkansas                                         DEFENDANTS

## **MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Levester Gillard, who is presently confined in the Arkansas Department of Correction, filed a pro se civil rights action under 42 U.S.C. § 1983, alleging that the defendants violated his constitutional rights while he was detained in the Howard County Detention Center.

On September 16, 2005, defendants filed a motion for summary judgment. (Docs. 29-31.) On November 16, 2005, the plaintiff filed his response to the summary judgment motion. (Doc. 40.) The plaintiff has also filed a motion for summary judgment which essentially refutes the arguments made in the defendants' motion for summary judgment. (Doc. 38.)

The motions for summary judgment are presently before the undersigned for issuance of this report and recommendation.

### I. Background

Gillard was booked into the Howard County Detention Center (HCDC) on three counts of rape on June 18, 2004. (Doc. 40 at ¶ 5.) During his stay at the HCDC, plaintiff had problems with his kidneys. (Doc. 40 at ¶ 6.)

On June 23, 2004, Gillard submitted a medical request, stating that he had blood and an

infection in his urine. Kuykendall made an appointment for Gillard to see Dr. Patel, the jail doctor, the following day. Dr. Patel advised Gillard to drink plenty of water and juices. Kuykendall instructed the kitchen staff to give Gillard a pitcher of ice water every day and to provide him with six pints of juice per day. Gillard states that he only received three, four ounce cartons of juice per day (one with each meal) and he was only given water "when they wanted to or had time to give it to [him]." (Doc. 40 at ¶¶ 7-9.)

On June 28, 2004, Gillard complained that he was not receiving enough juice each day. Kuykendall responded that the doctor's instructions were that Gillard was to receive plenty of juice and water and that Gillard was receiving 24 ounces of juice each day and had access to water at all times through a basin in his cell. In the summary judgment response, Gillard contends that he was only receiving 12 ounces of juice each day (Doc. 40 at ¶¶ 22-23), however, Gillard claimed in a grievance submitted on June 28, 2004, that he was receiving 20 ounces of juice each day (Doc. 29 at Ex. 4). Gillard was provided a "plastic pickle jug" from which he was able to get hot water from his cell basin. Then he had to wait for the water to cool before he could drink it. Sometimes he drank water from the showers. (Doc. 38, Doc. 40 at ¶ 10.)

On June 24, 2004, Dr. Patel, the jail doctor, prescribed medication for the plaintiff at 12:45 p.m. Plaintiff states in his complaint that he did not receive this medication until 4:50 p.m. that same day. (Doc. 1.) On June 25, 2004, at 2:45 p.m., plaintiff requested medication from officer Penny Reid, who is not a defendant. Reid responded that she was in the process of booking someone into the detention center and would not give Gillard the medication at that time. Gillard did receiving the medication at 5:30 p.m. (Doc. 1.) On June 29, 2004, Gillard asked for his medication at 9:30 a.m., but he did not receive it until 11:00 a.m. (Doc. 1.)

AO72A
(Rev. 8/82)

On June 30, 2004, Gillard submitted a medical request to see the doctor. Kuykendall called Dr. Patel and informed him that Gillard was out of pain medication. Dr. Patel stated that he needed to examine Gillard again and perform a dye test to see where the kidney stone was located. An appointment was scheduled for July 1, 2004. On July 1, 2004, Gillard was admitted to the Howard Memorial Hospital for treatment for kidney stones. At the hospital, Gillard was diagnosed with a congenital kidney abnormality which was non-obstructive. He was given Motrin, Lorcet (hydrocodone), and was told to consume plenty of fluids and to follow up with a doctor when released from jail. He was released the following day. (Doc. 40 at ¶¶ 28-30.)

On July 4, 2004, Gillard filed a grievance stating that he had asked for his pain medication on July 3, but that the medication was not given to him until noon, and that he did not receive the 6:00 a.m. dose. He also claimed that he had not received the medication prescribed by Dr. Parham, who treated him while he was in the hospital, but that he was receiving the medications Dr. Patel had prescribed the week before. Kuykendall responded that the prescription from Dr. Parham for hydrocodone was delivered to the jail on July 3 at approximately 11:30 a.m. and was dispensed to Gillard at that time. She noted that the prescription was "as needed" and not every six hours. (Doc. 26 at Ex. 6.) Gillard maintains that he did not receive the medication prescribed by Dr. Parham until July 7 and that he was supposed to receive that medication every 6 hours as that his how often he needed it for pain. (Doc. 40 at ¶¶ 31-33.)

On July 5, 2004, Gillard filed a grievance, stating that he had requested medication between 5:30 and 6:00 a.m., but did not receive it until after 7:30 a.m. when he made another request for it. He also stated that he had not received his anti-inflammatory medication that Dr.

Parham had prescribed. Kuykendall responded that Gillard did not have an anti-inflammatory prescription from Dr. Parham. (Doc. 29 at Ex. 7; Doc. 40 at ¶¶ 34-35.)

On July 7, 2004, Gillard filed a request for medical treatment, asking to see a doctor because of pain. Kuykendall responded that Gillard wanted to see Sheriff Morris and that after speaking to Sheriff Morris, Gillard no longer needed to see the doctor. (Doc. 29 at Ex. 8.) Gillard states that he never saw the sheriff except on court day. (Doc. 40 at ¶ 37.)

On July 7, 2004, Gillard submitted a grievance, claiming that jailer Joey Davis, who is not a defendant, told Gillard that he could either take ibuprofen or hydrocodone, but not both. Gillard selected the hydrocodone. Later that same morning, Davis brought Gillard a breakfast tray and no ibuprofen. Gillard stated that he was supposed to take ibuprofen with food and that Davis refused to give him ibuprofen. Kuykendall responded that Gillard had been advised that he would not receive hydrocodone and 600 mg of ibuprofen at the same time and that Gillard had chosen the hydrocodone. (Doc. 29 at Ex. 9; Doc. 40 at ¶¶ 38-39.)

On July 16, 2004, Gillard submitted a request for medical treatment, claiming that he needed to see a doctor because of blood in his urine and swelling on his side. Kuykendall's notes indicate that she spoke to Gillard and told him to save his urine in a cup when there was blood in his urine. Also, Gillard told Kuykendall that his pain was not constant and that there was blood in his urine only occasionally. (Doc. 29 at Ex. 10.) Gillard disagrees, stating that he was never told by the jail to provide a urine sample. (Doc. 40 at ¶¶ 40-41.)

On July 18, 2004, Gillard presented a request for medical treatment, saying that he needed to see Dr. Parham because of increased pain on his left side and "occasional spats of blood clots" in his urine. He also claimed to have an infected ingrown toenail and pain in his toe.

Kuykendall responded that Gillard was not saving his urine sample as instructed and that he had been kicking and beating on his cell door. (Doc. 29 at Ex. 11.) Gillard contends that he was never told to save a urine sample and that he never kicked his door with his toe. (Doc. 40 at ¶ 43.)

In a July 20, 2004 medical request, Gillard stated that he needed to see Dr. Parham about kidney complications and pain. He claimed that the medication was no longer effective. He also stated that his infection on his right toe had spread to his entire foot. Kuykendall's notes indicate that she spoke with Gillard who requested a phone call to his wife, medicine for his toe, and said that the pain medicine was not strong enough. According to Kuykendall, Gillard received peroxide and triple antibiotic ointment from Wal-Mart, and Kuykendall called Dr. Patel, who instructed that Gillard should continue receiving 600 mg of ibuprofen for the pain. (Doc. 20 at Ex. 12.) Gillard disagrees only in that the doctor did not prescribe the triple antibiotic ointment. (Doc. 40 at ¶¶ 44-45.)

On July 21, 2004, Gillard submitted a request for medical treatment, asking to see Dr. Parham. Gillard stated that his left side was swollen, that there was occasional blood clots in his urine, that the ibuprofen was effective some times but not every time. Kuykendall spoke with Dr. Patel who told her that Gillard only needed plenty of water and ibuprofen. (Doc. 29 at Ex. 13; Doc. 40 at ¶¶ 46-47.)

On September 23, 2004, Gillard complained that he was not receiving his medication with food and that taking the medication hours after eating made him sick. He also complained that he had difficulty getting his jug refilled with water after dinner and that he was supposed to be drinking plenty of water. Kuykendall responded that medications were given at prescription

AO72A
(Rev. 8/82)

times and that Gillard was able to refill his water jug through the sink in his cell at any time. (Doc. 29 at Ex. 14.)

Gillard also alleges in his complaint that his First Amendment rights were violated while he was detained in the HCDC. (Doc. 1.) On June 26, 2004, Gillard submitted an inmate grievance, stating that he should not be denied phone privileges because of his religious beliefs. (Doc. 29 at Ex. 3.) Gillard refused to clean his cell on Saturday because he recognized that day as the Sabbath. (Doc. 1.) The defendants contend, and plaintiff does not disagree, that there was a problem with ants and other bugs in Gillard's cell because of the empty juice cartons and that it was necessary for Gillard to clean his cell to avoid infestation problems. (Doc. 40 at ¶¶ 17-18.) While the defendants contend that Gillard was not required to work on the Sabbath, rather that he was to perform simple chores such as sweeping and mopping, Gillard argues that these chores were work. (Doc. 40 at ¶ 19.) Because he refused to clean his cell, Gillard was not allowed to watch television, exercise, or call his family. (Doc. 38; Doc. 40 at ¶ 21.) In her affidavit, Kuykendall states:

> Howard County has a written policy in place wherein all inmates are required to sweep and mop their cells every morning before breakfast. This policy is in place for administrative and disciplinary reasons. All inmates must abide by the policy or suffer consequences, such as denial of yard call and/or denial of phone privileges. The policy is applied even-handedly to all inmates. If the jail staff started making exceptions to the policy, the staff would receive a floodgate of inmates saying they cannot clean their cells for one reason or another. In order to avoid this problem, we ask that all inmates clean their cells every morning. It give the inmates a routine and makes them responsible for their own living spaces.

(Doc. 29 at Ex. 1.)

The defendants assert in their summary judgment motion that Gillard is suing them in

their official capacities only. (Doc. 29.) Further, they argue that Gillard has failed to point to a custom or policy that violated his constitutional rights. (Doc. 29.) Gillard does not disagree with the assertion that he is suing defendants only in their official capacities. (Doc. 40 at ¶ 1.) Also, he agrees that Howard County has a written policy in place that concerns medical treatment for inmates that provides for a routine sick call procedure wherein inmates are treated by a licensed medical professional after they fill out a written medical request. (Doc. 40 at ¶ 2.) Also, Gillard does not disagree with the defendants' contention that there is a written policy in place requiring all inmates to sweep and mop their cells every morning before breakfast, and a policy making each inmate responsible for his own living space. (Doc. 40 at ¶¶ 3-4.)

Plaintiff has also filed a motion for summary judgment. (Doc. 38.) This motion essentially refutes the grounds of defendants' motion for summary judgment. To the extent plaintiff raises additional claims in his motion for summary judgment, those claims should not be consider because they were not properly presented in his complaint or in an amended complaint. *See Cummings v. McCarter*, 826 F. Supp. 299, 300 (E.D. Mo. 1993) (refusing to consider any claim appearing for first time in response to summary judgment motion).

## II. Summary Judgment Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts,

-7-

AO72A
(Rev. 8/82)

by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l Bank of Commerce v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir.1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d 607 *(citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

### III. Discussion

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States. "To establish a claim under 42 U.S.C. § 1983, [a plaintiff] must show [1] a deprivation [under color of law] of [2] a right, privilege, or immunity secured by the Constitution or the laws of the United States." *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir. 1999). "[T]o establish a violation of constitutional rights under § 1983, the plaintiff must prove that the defendant's unconstitutional action was the 'cause in fact' of the plaintiff's injury." *Butler v. Dowd*, 979 F.2d 661, 669 (8th Cir. 1992).

**Official Capacity Claims**

In his complaint, Gillard does not state in what capacity--official and/or individual--he is suing defendants. Defendants assert that plaintiff has named them in their official capacities only, and plaintiff does not disagree with this contention. Under section 1983, a defendant may be sued in either his individual capacity, or in his official capacity, or claims may be stated

-8-

against a defendant in both his individual and his official capacities. In *Gorman v. Bartch*, 152 F.3d 907 (8th Cir. 1998), the Eighth Circuit discussed the distinction between individual and official capacity suits. As explained by the *Gorman* case:

> Claims against government actors in their individual capacities differ from those in their official capacities as to the type of conduct that is actionable and as to the type of defense that is available. Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself. Personal capacity claims, on the other hand, are those which allege personal liability for individual actions by officials in the course of their duties; these claims do not require proof of any policy and qualified immunity may be raised as a defense.

*Gorman*, 152 F.3d at 914 (citations omitted).

The Eighth Circuit has consistently advised plaintiffs to specifically plead whether government agents are being sued in their official or individual capacities to ensure prompt notice of potential personal liability. *Nix v. Norman*, 879 F.2d 429, 431 (8th Cir. 1989); *see also Andrus v. Arkansas*, 197 F.3d 953 (8th Cir. 1999) (in actions against officers specific pleading of individual capacity is required to put public officials on notice they will be exposed to personal liability). When the plaintiff fails to state whether he is suing an official in his individual capacity, the Eighth Circuit has construed the claim to be against the official in his official capacity only. *See Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999) ("in order to sue a public official in his or her individual capacity, a plaintiff must expressly and unambiguously state so in the pleadings, otherwise, it will be assumed that the defendant is sued only in his or her official capacity."); *Egerdahl v. Hibbing Community College*, 72 F.3d 615, 620 (8th Cir. 1995) ("*Nix* requires that a plaintiff's complaint contain a clear

AO72A
(Rev. 8/82)

statement of her wish to sue defendants in their personal capacities. Neither a cryptic hint in a plaintiff's complaint nor a statement made in response to a motion to dismiss is sufficient").

While the court has an obligation to construe a pro se complaint liberally, *see Haines v. Kerner*, 404 U.S. 519, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972), this requirement that individual-capacity claims be specifically pled has been applied to pro se litigants. *See Taylor v. Roper*, 53 Fed. Appx. 142 (8th Cir. 2003) (unpublished per curiam) (*citing Murphy v. Arkansas*, 127 F.3d 750, 754-55 (8th Cir. 1997) (Eighth Circuit strictly enforces this pleading requirement)).

Defendants assert that plaintiff is only bringing official capacity claims, and in response to this assertion, the plaintiff neither agrees nor disagrees. As noted above, official capacity claims are the equivalent of claims asserted against the employing entity--here Howard County. Under section 1983, a governmental entity may not be held vicariously liable for the unconstitutional acts of employees. A governmental entity, however, may be held liable for the unconstitutional acts of its officials or employees when those acts implement or execute an unconstitutional custom or policy. *See Doe v. Washington Co.*, 150 F.3d 920, 922 (8th Cir. 1998).

Thus, Howard County would be held liable for defendants' conduct only if it had a policy or custom that caused plaintiff's injury. *See Board of County Comm'rs v. Brown*, 520 U.S. 397, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997). In the absence of a written policy, plaintiff must identify a pattern of widespread unconstitutional conduct that was so pervasive and well-settled that it had the effect of law. *See Jane Doe A v. Special Sch. Dist. of St. Louis County*, 901 F.2d 642, 646 (8th Cir. 1990). Plaintiff must show that Howard County "through its deliberate conduct . . . was the 'moving force' behind the injury alleged." *Brown*, 117 S. Ct. at 1388.

AO72A
(Rev. 8/82)

"[I]naction or laxness can constitute government custom if it is permanent and well settled." *Tilson v. Forrest City Police Dept.*, 28 F.3d 802, 807 (8th Cir. 1994) (citation omitted). "Such a government custom of laxness or inaction must be the moving force behind the constitutional violation." *Id.*

The plaintiff agrees that there is a written policy in place concerning medical treatment for inmates that states inmates will be treated by a licensed medical professional after they fill out a written medical request. As such, Gillard cannot say that his constitutional rights were violated based on an unconstitutional policy. Gillard has not alleged a widespread pattern of unconstitutional conduct pertaining to medical care that was so pervasive and well-settled that it had constituted a county custom. *See Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999) (single incident normally does not suffice to prove existence of custom). Therefore, Gillard has failed to state a claim against defendants in their official capacities for deliberate indifference to his serious medical needs, and thus the motion for summary judgment should be granted on this claim.

Gillard also contends that the jail's policy of requiring inmates to clean their cells every day of the week, including Saturday, which Gillard recognizes as the Sabbath Day, violated his First Amendment rights.

A plaintiff claiming that a governmental policy or action violates his right to exercise his religion freely must establish that the action substantially burdens his sincerely held religious belief. *See Weir v. Nix*, 114 F.3d 817, 820 (8th Cir. 1997). To constitute a substantial burden on a person's free exercise rights, the governmental action must (1) significantly inhibit or constrain conduct or expression that manifests some central tenant of the plaintiff's individual

AO72A
(Rev. 8/82)

religious beliefs, (2) must meaningfully curtail a plaintiff's ability to express adherence to his faith, or (3) must deny a person reasonable opportunities to engage in those activities that are fundamental to his religion. *See id.*

"[W]e have often said that evaluation of penological objectives is committed to the considered judgment of prisoner administrators." *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349, 342 S. Ct. 2400, 96 L.#d. 2d 282 (1987). Thus, the court applies a "reasonable" test to alleged infringements on the First Amendment rights of prisoners. This test is less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights. *See O'Lone*, 482 U.S. at 349. "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *See Turner v. Safley*, 482 U.S. 78, 89, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987). In determining whether a regulation is reasonable, courts consider (1) whether there is a valid, rational connection between the regulation and the interest asserted; (2) whether alternative means of exercising the right remain open to the prisoner; (3) the effect the requested accommodation will have on guards, other inmates, and the allocation of prison resources; and (4) whether there is some alternative which will accommodate the prisoner's needs with de minimis impact on the prison's asserted interests. *See Turner*, 482 U.S. at 89-91.

Requiring the plaintiff to perform cleaning chores on the Sabbath Day, which plaintiff asserts violated a tenet of religious faith that no work be performed on the Sabbath, clearly creates a substantial burden on his ability to adhere to his religious beliefs. First, the defendants argument that requiring plaintiff to perform the chores of cleaning his cell did not constitute work and that plaintiff would have "surely" emptied his trash and performed "some simple daily

AO72A
(Rev. 8/82)

chores" had he not been incarcerated, unconvincing. Certainly a question remains as to what plaintiff's religious faith required in observance of the Sabbath Day and what actions he took on the Sabbath Day while not incarcerated. Second, defendants' argument that a legitimate penological interest permitted the policy that all inmates clean their cells every day is similarly unpersuasive. The defendants present no evidence to support their claim that allowing the plaintiff to refrain from cleaning his cell for one day out of the week would disrupt the jail security or administration. Further, the defendants make no attempt to address the remaining factors established in Turner that the court should consider in determining if the regulation is reasonably related to legitimate penological interests. Therefore, defendants' motion for summary judgment on the issue of whether the jail policy of requiring inmates to clean their cells every day infringed upon defendants First Amendment rights, should be denied. As genuine issues remains, plaintiff's motion for summary judgment on this issue should also be denied.

**Individual Capacity Claims**

Even if the court were to construe Gillard's complaint to raise deliberate indifference claims against the defendants in their individual capacities, the action would be subject to the grant of summary judgment.

Gillard contends that defendants were deliberately indifferent to his serious medical needs of kidney problems in that defendants failed to provide him with adequate medical care for his kidney problems and failed to provide him with proper water or juices.

"In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). The deliberate indifference standard

-13-

includes "both an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). Additionally, "'[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" *Jolly*, 205 F.3d at 1096 (*quoting Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir.1995)). *See also Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000) ("To establish a constitutional violation, it is not enough that a reasonable official should have known of the risk, a plaintiff must establish that the official in question did in fact know of the risk.").

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992). "A medical need is serious if it is obvious to the layperson or supported by medical evidence." *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997) (per curiam) (internal quotation and citation omitted).

"[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). In *Dulany v. Carnahan*, 132 F.3d 1234 (8th Cir. 1997), the Eighth Circuit said:

As long as this threshold is not crossed, inmates have no constitutional right to

-14-

AO72A
(Rev. 8/82)

> receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment. Deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoner's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 290, 50 L. Ed. 2d 251 (1976). Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation. *Id.* at 106, 97 S. Ct. at 292.

*Dulany*, 132 F.3d at 1239. *See also Tlamka v. Serrell*, 244 F.3d 628, 633 (8th Cir. 2001).

First, plaintiff has failed to present any evidence that Sheriff Morris was aware of his medical condition or made any decisions about his condition. Without such evidence, there is no basis for holding Sheriff Morris liable in this action.

Second, the alleged medical deprivations do not rise to the level of constitutional violations. Plaintiff was provided some additional juices and a jug with which he could collect water to drink as ordered by the jail doctor. Also, plaintiff was admitted to the hospital for treatment of his kidney abnormality and provided both hydrocodone and ibuprofen for pain management. Plaintiff was given peroxide and triple antibiotic ointment for his infected toe. Kuykendall regularly consulted with the jail doctor concerning plaintiff's condition. The defendants were not deliberately indifferent to plaintiff's serious medical needs because plaintiff suffered occasional delays in receiving medication or did not receive the treatment he wished. Plaintiff has presented nothing to suggest that the delays were caused by more than negligence on behalf of the jailers, and he has no right to insist upon a certain course of treatment such as to see a specialist at his request. *See Dulany*, 132 F.3d 1239 (inmates have no constitutional right to a particular course of treatment); *cf. Williams v. Kelso*, 201 F.3d 1060, 1065 (8th Cir. 2000) (holding that even if instructions were to check vital signs of inmate every four to six

-15-

hours, failure to check them over seven hours does not constitute deliberate indifference).

Therefore, even if Gillard had brought a claim of deliberate indifference to his serious medical needs against the plaintiff's in their individual capacities, such a claim would be subject to dismissal.

**Remaining Claims**

In his complaint, plaintiff also alleges that on June 29, 2004, he submitted a letter to be mailed to his pastor, but that jail kept the letter and returned to Gillard the following week. Because indigent inmates are only allowed two stamps to mail letters, plaintiff was unable to send the letter to his pastor that second week as he had already sent two letters. Plaintiff contends that the jail staff intentionally held his mail.

Although defendants fail to address this issue in their summary judgment motion, the claim is subject to dismissal. The fact that Howard County provided indigent inmates two stamps per week that could be used on personal mail is more than is required under the Constitution, and therefore plaintiff did not suffer a constitutional harm when one personal letter was not delivered. *See Kaestel v. Lockhart*, 746 F.2d 1323, 1325 (8th Cir. 1984) (per curiam) ("state need not provide postage for indigents' nonlegal mail").

Also, the defendants failed to address plaintiff's claim that he was subjected to excessive bail. Plaintiff states that his bond amount was set for one million dollars, but that he had no assets of value equal to $200. "In Arkansas, the function of determining the appropriateness of pretrial release, the amount of bail bond, and the type of bail bond lies solely with the judicial officer." *See Walden v. Carmack*, 156 F.3d 861, 874 (8th Cir. 1998) (*citing* Arkansas Rules of

Criminal Procedure 8.5 and 9.2). Thus, neither Sheriff Morris nor Kuykendall was responsible for the bail that was set for Gillard, and this claim should be dismissed.

## IV. Conclusion

Therefore, I recommend that defendant's motion for summary judgment (Doc. 29) be granted in part and denied in part.

Defendants' motion for summary judgment should be granted as to claims against them in their official capacity concerning the medical care plaintiff received while detained at the Howard County Detention Center.

Defendants' motion for summary judgment should be denied as to claims against them in their official capacity concerning the alleged violation of plaintiff's First Amendment rights.

Claims of interference with personal mail and excessive bail should be dismissed for failing to state a claim. *See* 28 U.S.C. § 1915(e)(2)(B)(i)-(iii) (IFP action, or any portion thereof, may be dismissed on such grounds at any time).

Plaintiff's motion for summary judgment (Doc. 38) should be denied.

**The parties have ten days from receipt of this report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely written objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

AO72A
(Rev. 8/82)

DATED this 15th day of August 2006.

                                      **/s/ Bobby E. Shepherd**
                            _____
                            HON. BOBBY E. SHEPHERD
                            UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)